IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

ANTWON WHITTEN,           )
                                 )
          Plaintiff,        )     Case No. 7:19-cv-00728
                                 )
v.                           )     **MEMORANDUM OPINION**
                                 )
J. G. JOHNSON,             )     By:  Hon. Thomas T. Cullen
                                 )           United States District Judge
          Defendant.      )

Plaintiff Antwon Whitten, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983 against Defendant J. G. Johnson, asserting claims of excessive force and retaliation. On November 17, 2022, the court conducted an evidentiary hearing on Whitten's second motion for spoliation sanctions and a bench trial on the merits of Whitten's claims against Johnson. Having carefully reviewed the evidence presented, the court issues this Memorandum Opinion setting forth its findings of fact and conclusions of law. For the reasons stated herein, the court will deny Whitten's second motion for spoliation sanctions and enter judgment in favor of Johnson on all claims.

## I.    BACKGROUND

This case stems from an incident that occurred outside Whitten's cell in the C-4 housing unit at Red Onion State Prison ("Red Onion"), a maximum-security facility, on the morning of January 18, 2018. Johnson was one of two correctional officers responsible for preparing Whitten to be transported to the federal courthouse in Big Stone Gap, Virginia, for a jury trial in a § 1983 suit that Whitten had filed against a correctional officer at Wallens Ridge State Prison ("Wallens Ridge"). While the other officer was examining the paperwork that

Whitten planned to take with him to court, Johnson took Whitten to the ground. Whitten maintains that the use of force was unjustified. Johnson, on the other hand, contends that Whitten attempted to elbow him in the face. Following the incident, Johnson filed a disciplinary charge against Whitten for attempted assault.

Whitten brought this action against Johnson on October 30, 2019. He claims that Johnson used excessive force against him in violation of the Eighth Amendment. Whitten also contends that Johnson knew that he was on his way to court for trial in a case against a correctional officer and that Johnson retaliated against him for engaging in protected First Amendment activity by using force against him and by filing a false disciplinary charge.

After engaging in discovery, Whitten filed a motion for spoliation sanctions and a motion *in limine*. In both motions, Whitten argued that Johnson should be sanctioned because prison officials did not preserve video footage from the C-4 housing unit. Although prison officials retained footage from one MaxPro camera that captured the use of force against Whitten, Johnson acknowledged that prison officials did not preserve footage from two other MaxPro cameras.

On March 25, 2022, the court denied both of Whitten's motions without prejudice. To the extent Whitten requested default judgment or other sanctions for the admitted failure to retain footage from two MaxPro cameras, the court declined to impose sanctions under Federal Rule of Civil Procedure 37(e). (*See* Mem. Op. at 9–13 [ECF No. 92].) Among other deficiencies, the court concluded that Whitten had not made a threshold showing that footage from those particular cameras "should have been preserved." (*Id.* at 10 (quoting Fed. R. Civ. P. 37(e).) In response to the motion, Johnson submitted still photographs taken from the two

other cameras. The court noted that one of the cameras was directed toward a different side of the housing unit and, therefore, Whitten was unable to demonstrate that footage from that camera would have shown any portion of the incident at issue. The other camera provided a bird's eye view of the entire housing unit. Therefore, the court noted that even if that camera could have potentially captured the incident in question, "the view from that camera would have been at such a distance as to make the interaction between Whitten and Johnson considerably more difficult to see than the footage from [the camera that was actually retained]." (*Id.* at 11.)

In Whitten's reply brief in support of the motion for spoliation sanctions (ECF No. 88), Whitten asserted that a fourth camera could be seen above the entry door in one of the still photographs submitted by Johnson and that footage from that camera should also have been preserved. Based on these new arguments, the court construed the reply brief as a second motion for spoliation sanctions and set a briefing schedule on the motion. (*See* Mem. Op. at 13; Order at 1 [ECF No. 93].) Johnson subsequently submitted a supplemental affidavit from Lieutenant C. Stanley, which indicated that there were only three MaxPro cameras in the C-4 housing unit in January 2018, and that any other camera on the wall would have been a nonoperational Rapid Eye Camera. (Stanley Supp'l Aff. ¶ 7 [ECF No. 94-1].) In reply, Whitten asserted, under penalty of perjury, that he was in the housing unit when the MaxPro cameras were installed and that the "entry door camera [was] the 1st camera installed by the MaxPro installers that day." (Pl.'s Reply at 1 [ECF No. 95].) In light of the conflicting sworn statements, the court concluded that an evidentiary hearing was necessary to resolve the parties' dispute

over whether prison officials could and should have saved footage from a fourth video camera in the C-4 housing unit. (Order at 1 [ECF No. 100].)

On November 8, 2022, the court conducted a final pretrial conference. On November 10, the court advised the parties that it would "conduct a pretrial evidentiary hearing on November 17, 2022, to determine whether spoliation of video evidence from an alleged fourth camera located on the wall inside the C-4 housing unit at Red Onion did, in fact, occur, and if it did, whether a spoliation sanction is warranted in this case." (Order at 1 [ECF No. 108].) The court directed defense counsel to make arrangements for Virginia Department of Corrections ("VDOC") employees to testify at the hearing who would have knowledge of the installation of the fourth camera and its operational status in January 2018. (*Id.*) The court also directed defense counsel to make arrangements for Whitten to have access to certain evidence during the evidentiary hearing and bench trial, and for particular individuals to be available to testify at trial. (*Id.* at 2–4.)

## II.    TESTIMONY AND OTHER EVIDENCE

### A.    Evidentiary Hearing

During the evidentiary hearing on Whitten's second motion for spoliation sanctions, the parties presented testimony and documentary evidence. The court heard the testimony of Wesley Graham, Joe Fannin, C. Stanley, and Whitten.

### 1.    Wesley Graham

The first witness, Wesley Graham, is an electronics technician at Red Onion. In that position, Graham is responsible for "tak[ing] care of cameras, door controls, intercom[s]," and other electronic equipment. (Evid. H'rg & Bench Trial Tr. ("Tr.") at 21:21–25 [ECF No. 118].)

Graham was employed at the prison in 2016, when the prison switched from using the Rapid Eye camera system to the MaxPro camera system. Graham testified that three MaxPro cameras were installed in the C-4 housing unit in mid-to-late 2016. (*Id.* at 22:3–7, 23:21–23.) He explained that the Rapid Eye system remained online for approximately 90 days after the new MaxPro system was installed. The prison then turned off the recording equipment for the Rapid Eye cameras and exclusively used the MaxPro system. (*Id.* at 23:24–25, 24:1–24.)

Graham testified that the old Rapid Eye cameras remained in the housing units at Red Onion until approximately "six or eight months" prior to the evidentiary hearing on November 17, 2022, even though the cameras were no longer operational. (*Id.* at 28:1–25.) Whitten introduced a still photograph taken from a camera in the C-4 housing unit on February 1, 2021, which was previously submitted in response to Whitten's first motion for spoliation sanctions. (*See* Pl.'s Evid. H'rg Ex. 1.) Graham identified the camera depicted above the entry door as one of the Rapid Eye cameras that had since been removed. (Tr. at 29:25, 30:1–18.) Graham testified that the camera was still mounted in the C-4 housing unit on January 18, 2018, when the incident giving rise to this action occurred, but that it was no longer recording video footage at that time. (Tr. at 31:14–25, 32:1–5.)

### 2.    Joe Fannin

Joe Fannin worked as an institutional investigator at Red Onion in January 2018. On February 14, 2018, Fannin responded to an offender request form submitted by Whitten in which Whitten requested that video footage from the C-4 housing unit on the morning of January 18, 2018, be "preserved for legal litigation against C/O Johnson." (Def.'s Evid. H'rg Ex. 1.) In response to Whitten's request, Fannin wrote, "This incident has been saved." (*Id.*)

During the evidentiary hearing, Fannin testified that footage of the incident at issue was preserved from one of the three MaxPro cameras in the housing unit and that prison officials "saved the best angle at the time." (Tr. at 39:10–14.) Fannin also testified that Johnson played no role in deciding which video footage to save. (*Id.* at 39:25, 40:1–13.)

During cross-examination by Whitten, Fannin testified that he viewed footage from all three MaxPro cameras in the housing unit and ultimately saved footage from the camera located across from the area in which the underlying incident occurred. Fannin explained that that particular camera was "straight ahead" and therefore provided "the best angle video." *Id.* at 42:8–13.) In response to further questioning, Fannin testified that "you couldn't see exactly what happened" on the footage recorded by the other two cameras. (*Id.* at 43:22–25, 44:1–3.)

Whitten subsequently showed Fannin the still photograph from the C-4 housing unit that was previously admitted as Plaintiff's Evidentiary Hearing Exhibit 1. (*Id.* at 44:6–16.) The deputy clerk printed another copy of the photograph for Fannin to use for identification purposes, which was introduced as Plaintiff's Evidentiary Hearing Exhibit 1A. (*Id.* at 47:8–25, 48:1–7.) Fannin identified one camera depicted in the photograph as a MaxPro camera. (*See* Pl.'s Evid. H'rg Ex. 1A (marked and signed by Fannin).) He identified a second camera shown in the photograph above the entry door as a Rapid Eye camera. (*Id.*)

### 3.    C. Stanley

Lieutenant C. Stanley testified next. Whitten asked Stanley to review the supplemental affidavit that was previously submitted in response to Whitten's second motion for spoliation sanctions. (*Id.* at 54:17–22; *see also* Pl.'s Evid. H'rg Ex. 3.) Stanley confirmed that certain

statements in the supplemental affidavit were true to the best of his knowledge, including the

following:

> Q. I'm going to go down to Number 4 and read it . . . . It says at Number 4, it says, "When Red Onion State Prison first installed a surveillance camera system, they used the Rapid Eye surveillance system throughout the facility. In 2016, however, Red Onion State Prison installed the MaxPro surveillance system to replace the old Rapid Eye system."
>
> Is that true to your recollection?
>
> A. To the best of my knowledge, yes.
>
> Q. Do you have any documentation to substantiate that in the courtroom?
>
> A. I do not.
>
> Q. I'm going to Number 5. It says, "The MaxPro system is a completely different surveillance system than the Rapid Eye system, and it does not utilize Rapid Eye cameras. When the MaxPro was installed, new MaxPro cameras were installed throughout the facility. When the MaxPro cameras were installed, some of the Rapid Eye cameras remained on the walls in the housing unit. However, those Rapid Eye cameras were completely disabled . . . when the MaxPro became operational . . . and those Rapid Eye cameras were not connected to any surveillance system. Any Rapid Eye cameras still on the walls of the housing units were not functioning when the incident with Mr. Whitten occurred on January 18, 2018."
>
> Is that statement true to the best of your knowledge?
>
> A. Yes, it is.
>
> . . . .
>
> Q. And your knowledge came from where?
>
> A. When they installed the new cameras, we were told that the other system was not operational, and we didn't have

> access to the program on the computers. Everything switched to MaxPro.
>
> Q.    Disconnected completely?
>
> A.    To the best of my knowledge, yes.

(*Id.* at 56:6–25, 57:1–20.)

During cross-examination by defense counsel, Stanley testified that he had "no knowledge" of whether "the Rapid Eye cameras were left operational for a short period of time while [the MaxPro] system was getting established." (*Id.* at 65:17–25; *see also id.* ("I just don't know.").) Stanley again confirmed that, to the best of his knowledge, the Rapid Eye cameras were not operational in January 2018, when the incident giving rise to this action occurred. (*Id.* at 66:1–6.)

### 4.    Whitten

Whitten was the final witness at the evidentiary hearing. During his testimony, he utilized the still photograph introduced as Plaintiff's Evidentiary Hearing Exhibit 1. (*Id.* at 67:17–24.) Whitten testified that he "was in those housing units in C Building at the time when [the MaxPro cameras] were installed" in 2016 and that he "watched them install those cameras and the process they used to install them." (*Id.* at 68:4–11, 71:16–18.) Whitten acknowledged that he could not confirm "which housing unit [in C Building he] was in" or what particular "cell [he] was in in 2016." (*Id.* at 68:7–8.) Nonetheless, Whitten testified that he observed installers running wires to the camera that other witnesses had identified in the photograph as a Rapid Eye camera. (*Id.* at 69:18–22.) When asked to clarify what he meant by that testimony, Whitten testified that the camera identified by the other witnesses as a Rapid Eye camera is actually a MaxPro camera. (*Id.* at 74:14–18.)

### B.      Bench Trial

Following argument on the spoliation motion and opening statements, the parties presented testimony and other evidence relevant to the merits of Whitten's claims of excessive force and retaliation. The witnesses included, among others, Johnson, Jason Lawson, Eric Shirks, Chris Mullins, Whitten, and Michael Williams. The testimony and other evidence most relevant to the court's findings and conclusions is summarized below.

### 1.      Johnson

Whitten called Defendant Johnson as his first witness. Johnson worked as a correctional officer at Red Onion in January 2018. (*Id.* at 92:4–8.) He resigned from the Virginia Department of Corrections in June 2019 after being hired to work in the federal prison system. (*See id.* at 9:19–25 (summarizing Johnson's written response to an inquiry from Whitten regarding the circumstances of his departure from employment at Red Onion).

According to Johnson's testimony, on the morning of January 18, 2018, he and Correctional Officer Shirks were responsible for searching Whitten and preparing him "to be taken to federal court." (*Id.* at 93:13–15.) After Whitten exited his cell in handcuffs and leg shackles, Johnson held Whitten "steady" outside the cell while Shirks checked Whitten's legal paperwork for contraband. (*Id.* at 94:9–13.) Johnson testified that Whitten was "upset because Shirks was going through [Whitten's] stuff"; Whitten "kept trying to turn [toward Shirks], and [Johnson] told [Whitten to] face forward." (*Id.* at 96:18–25.) Johnson further testified that Whitten "kept turning, and then [Whitten] tried to elbow [him] in the face." (*Id.* at 97:2–3; *see also id.* at 97:18–25.) At that point, Johnson "put [Whitten] on the ground." (*Id.* at 98:1–2.) Johnson testified that his reason for doing so was to protect his own safety. (*Id.*)

Whitten questioned Johnson regarding two written statements prepared following the incident. The first statement was included in a disciplinary offense report completed by Johnson at 8:40 a.m. on January 18, 2018. (*See* Pl.'s Trial Ex. 1 at 1.) The report charged Whitten with "Attempting to Commit/Simple Assault Upon a Non-offender." (*Id.*) In the report, Johnson included the following description of the offense:

> On 1/18/18 at approximately 714am while pulling offender A. Whitten from his cell to go to receiving, the offender became irate and tried to elbow me in the face. Offender placed on the ground. No force used. Sgt. Williams notified. Offender charged per OP 861.1.

(*Id.*)[1] The second statement was handwritten on March 5, 2018, when Johnson was interviewed by Jason Lawson during the course of an institutional investigation. Johnson reported as follows:

> At the time I had Offender A. Whitten outside of his cell getting ready for transportation. The offender became disruptive trying to turn around on me. I gave him a few orders to face forward and stop trying to turn around. At no time did I call the offender names. The offender then tried to elbow me in the face. I placed the offender on the ground. I did not use my body weight to keep him down, nor did I tighten his cuffs or leg irons. I did not call the offender boy.

(Pl.'s Trial Ex. 2.) When Whitten asked Johnson whether he saw any inconsistencies between the two statements, Johnson responded in the negative. (Tr. at 100:6–8.) In response, Whitten noted that the statement in the disciplinary offense report made no mention of Whitten "trying to turn or anything" and instead indicated that Whitten "became irate and tried to elbow

---

[1] The court quotes from the statements and reports in the record as written.

[Johnson] in the face." (*Id.* at 100:9–13.) In response, Johnson explained that he was "keeping [his description] short." (*Id.* at 100:14.)

Whitten then inquired as to whether he was aggressive or resistant after being taken to the ground. Johnson testified that Whitten was behaving in an aggressive manner when he took Whitten to the ground, but that Whitten did not try to resist Johnson after reaching the ground. (*Id.* at 101:7–18, 102:1–11.) In response to further questions, Johnson confirmed that Whitten was not aggressive after Johnson placed him on the ground. (*Id.* at 102:12–15.) When asked again if Whitten "basically ceased and desist[ed] being aggressive" and "just gave up," Johnson agreed. (*Id.* at 103:1–6.)

Following Whitten's direct examination of Johnson, the court asked Johnson to stand up and demonstrate the manner in which Whitten allegedly attempted to elbow him. Johnson placed his hands behind his back, as if he were wearing handcuffs. (*Id.* at 104:4–21.) Johnson then bent over and raised both hands behind his back in a manner that caused his left elbow to lift in the air. (*Id.* at 105:2–9.) When asked if Whitten bent over in the same fashion as he had demonstrated, Johnson replied, "As far as I know, sir." (*Id.* at 105:10–12.)

On cross-examination, defense counsel first introduced into evidence the video footage retained from a MaxPro camera in the C-4 housing unit on January 18, 2018. (*See* Def.'s Trial Ex. 1.) The camera was located across from the area of the housing unit in which the incident occurred. The recorded footage is approximately eleven minutes long and has no audio. The beginning of the video recording is date- and time-stamped "1-18-2018 07:17:00." (*Id.*) It shows two officers walking up to cell 412 on the second level of the housing unit while a third officer walks to a table on the lower level. The two officers arrive at cell 412 at the 00:21 mark

- 11 -

of the video.[2] Johnson testified that Officer Shirks is standing to the left in front of the closed cell door, that he is standing to the right, and that Whitten is the inmate in the cell. (Tr. at 108:8–15.) Nearly six minutes later, at the 06:11 mark of the video, Shirks slides the cell door open and Johnson kneels down to place Whitten in leg restraints. Whitten, who is already handcuffed, then stands up, exits the cell, and turns his body so that his left side is facing the cell. At the 06:55 mark, Johnson is standing between Whitten and Whitten's cell, and Shirks is standing behind Whitten while he examines Whitten's paperwork. After Whitten turns his head to the left toward Shirks, Johnson lifts his left arm and points it in the opposite direction at least twice, including at the 07:04 mark. Three or four seconds later, Johnson takes Whitten to the ground. Whitten lands on his right side, followed by Johnson, and the right side of Johnson's body, including his right arm, is positioned across Whitten's left side. At that point, Shirks walks over to Johnson and Whitten, and the officer sitting at the table on the lower level heads toward them on the upper level. At the 07:29 mark, Johnson rises to his knees, leaving his arms across Whitten. At the 07:59 mark, Johnson and Shirks lift Whitten from the ground and stand with him outside his cell, while a fourth officer arrives on the scene. At the 09:55 mark, the officers escort Whitten down the stairs and out of the housing unit. The door to the housing unit closes at the 10:39 mark.

While reviewing the video footage with Johnson, defense counsel paused the video at the 07:05 mark, after Johnson can be seen lifting his left arm in the air. (*See* Tr. at 111:23–25.) When asked to explain what he recalled was happening during that portion of the recording,

---

[2] Consistent with the parties' references to the video footage at trial, the court will refer to the elapsed time at the bottom of the video when describing specific portions of the footage.

Johnson testified that he was "telling [Whitten] he needed to face forward and stop turning." (*Id.* at 112:1–3.) Defense counsel then paused the video at the 07:08 mark. At that point, Whitten is bent over, and it appears that Johnson has his right arm around Whitten's right shoulder. When asked what happened "just before this particular paused image in the video," Johnson said, "That's whenever he would try to elbow me." (Tr. at 112:12–14.) Defense counsel then asked Johnson whether Whitten "actually" elbowed him or simply made "a body movement indicative of him trying to get his elbow up. (*id.* at 112:15–17); Johnson testified that Whitten "made a body movement that tried to get it [up]" (*id.* at 112:18).

Defense counsel paused the video again at the 07:11 mark. At that point, Johnson and Whitten are on the floor and Shirks has walked over to them. Defense counsel asked Johnson to explain how he was positioned on the floor in relation to Whitten. Johnson testified that he was attempting to have "side control from the left" and that he positioned "some weight on top of [Whitten] but not all [his] weight." (*Id.* at 113:8–10.) In other words, Johnson's weight was "off to one side," but he was "still exerting enough force" to hold Whitten down on the ground. (*Id.* at 113:11–16.) Johnson denied applying his full body weight in the process. *Id.* He also denied applying force or pressure to Whitten's handcuffs or leg shackles in an effort to impose additional pain. (*Id.* at 113:17–20.) When asked what he was doing during the period of time that he was on the ground, Johnson testified that he was "just trying to gain control of the situation." (*Id.* at 114:2.)

Defense counsel then asked Johnson a series of questions regarding his prior knowledge of Whitten. Johnson testified that he had not had any previous interactions with Whitten; that he was unaware of Whitten's security level; that he did not know whether

Whitten was going to federal court or state court; and that he did not know if the court proceeding was in a civil case or a criminal case. (*Id.* at 114:13–25, 115:1–5.) Johnson further testified that the fact that Whitten was on his way to court had nothing to do with Johnson's decision to place Whitten on the ground and that he would have taken the same actions even if Whitten had not been on the way to court. (*Id.* at 115:6–14.) Likewise, Johnson testified that the fact that Whitten was on the way to court played no role in the decision to charge Whitten with a disciplinary offense and that he would have still written the disciplinary charge even if Whitten had not been on the way to court. (*Id.* at 116:9–20.) In response to additional questions, Johnson testified that he did not know that Whitten had a pending court case against individuals employed by the VDOC and that he did not write the disciplinary charge to retaliate against Whitten for filing a lawsuit against VDOC employees. (*Id.* at 116:24–25, 117:1–5.) Johnson further testified that he was not trying to hurt Whitten when he took Whitten to the ground and that he was simply attempting to "gain control." (*Id.* at 117:10–13.) When asked what he was "thinking might happen to [him] if [he] did not taken Mr. Whitten to the ground," Johnson testified that he thought Whitten "could possibly hurt [him]. (*Id.* at 118:1–3.) Johnson confirmed that officers at Red Onion had been harmed by inmates in the past and that he was aware of such information at the time of the incident in question. (*Id.* at 118:4–8.)

Defense counsel recalled Johnson as a witness during the defense case-in-chief. She showed Johnson a still frame image captured from the surveillance video at the 07:07 mark. (*Id.* at 270:24–25.) The image was admitted into evidence as Defendant's Trial Exhibit 3. When asked to describe what Whitten is doing in the image, Johnson responded, "It looks like he is

trying to elbow me in the face." (Tr. at 271:8–9.) In the image, Whitten's left side is facing Johnson, and his head is turned toward Johnson. Whitten's right knee is bent, and his right arm is positioned in a manner that would cause his left elbow to rise toward Johnson. (*See* Def.'s Trial Ex. 3.)

### 2.  Jason Lawson

Jason Lawson appeared remotely via zoom.gov. Lawson is an assistant chief with the VDOC's Special Investigations Unit, and he was responsible for investigating the incident that occurred on January 18, 2018. (Tr. at 152:19–25.) Lawson testified that he initiated the investigation after being advised that Whitten had reported being subjected to physical abuse by Johnson. (*Id.* at 154:1–5.) As part of the investigation, Lawson interviewed Whitten, Johnson, and Shirks and reviewed reports previously prepared regarding the incident and the video footage obtained from the prison. (*Id.* at 154:6–12.)

Lawson's investigation report was admitted into evidence as Plaintiff's Trial Exhibit 5, and Whitten questioned Lawson regarding his interviews of Shirks, Johnson, and Whitten. Whitten first directed Lawson's attention to a written statement that he obtained from Shirks on March 5, 2018. (*Id.* at 156:5–7.) That statement reads: "At no time did I Officer E. Shirks hear Officer Johnson call Offender Whitten any names. The only thing I heard Officer Johnson say was to quit trying to turn around." (Pl.'s Trial Ex 5 at 19.)

Whitten then turned to the portion of the investigative report summarizing Lawson's March 5, 2018, interview of Whitten. (*See* Tr. at 159:4–8.) According to the report:

> Offender Whitten acknowledged that he attempted to look to his rear and that Corrections Officer Johnson gave orders to look forward and stop trying to turn around. Offender Whitten acknowledged his awareness that offenders are to obey orders

given by security staff but stated he did not comply because he disagreed with the way Corrections Officer Johnson allegedly gave the orders (using the term "boy"). Offender Whitten recalled that when Corrections Officer Johnson pulled him closer, he responded by pulling away and his left elbow came slightly up. Offender Whitten maintained that he was not attempting to elbow the officer and further explained that his elbows were facing away from the officer and not in a position to do harm.

Offender Whitten stated that he had never interacted with Corrections Officer Johnson prior to January 18, 2018, and had no reason to assault him. Offender Whitten further stated that he has attempted to stay out of trouble as an incarcerated offender.

. . . .

Offender Whitten stated he wished for the original submitted Informal Complaint and Regular Grievance to serve as his written statement and declined to reduce anything further to writing.[3]

(Pl.'s Trial Ex. 5 at 3.)

Whitten then read the following summary of Lawson's interview of Johnson into the record:

On March 5, Special Agent Lawson interviewed Correctional Officer Johnson at Red Onion State Prison. Special Agent Lawson identified himself as a sworn law enforcement officer in

---

[3] Whitten signed the informal complaint on January 21, 2018. He summarized the nature of his complaint as follows:

On 1-18-208 @ approx. 7:14 a.m. C/O J. G. Johnson was calling me boy over and over and his hand was gripped tightly on my left arm, when I told him, 'Who you think you talking too?' He pulled me towards him and I pulled away from him. At no time was my elbow(s) near his body. He took me to the floor and pressed his full weight on the restraints (hands [and] ankles) in order to cause me physical harm [and] pain. My ankles were bleeding and my wrist scarred up and some swelling/bruising. I want an investigation.

(Pl.'s Trial Ex. 5 at 10.) In the regular grievance signed on January 25, 2018, Whitten further asserted that he was suffering from back pain as a result of Johnson's "overly aggressive conduct." (*Id.* at 11.)

the Commonwealth of Virginia, stated the allegation against the officer, and advised the officer that participation in the interview was voluntary. Corrections Officer Johnson consented to the interview and recalled that the offender attempted to look and turn to the rear, he gave Offender Whitten a few orders to face forward, the offender attempted to elbow him in the face, and he took the offender to the ground. Corrections Officer Johnson denied that he called the offender names, used the term "boy," used his weight on the offender while on the ground, or tightened the restraints. Corrections Officer Johnson rendered a volun[tary] signed handwritten statement for this interview at Exhibit B.

(Tr. at 162:4–22 (quoting Pl.'s Trial Ex. 5 at 4).)

### 3.    Eric Shirks

Eric Shirks has worked at Red Onion for more than six years. (*Id.* at 169:1–3.) He confirmed that he was present during the incident involving Whitten and Johnson on January 18, 2018. (*Id.* at 169:7–12.) Whitten initially questioned Shirks regarding an internal incident report prepared by Shirks on January 18, 2018, which was admitted as Plaintiff's Trial Exhibit 6. (*See id.* at 170–73.) The incident report includes the following description of the incident:

At approximately 7:14 am while getting offender A. Whitten #1138537 housed in C-412 ready to go to receiving for transportation, I was searching the offender's paperwork and he became disruptive. I heard Officer Johnson tell the offender to stop trying to turn around. I had just put the paperwork in the tray slot and was getting ready to enter the cell for inspection when I heard offender yelling. I then turned and saw Officer Johnson maintaining control of the offender on the ground. Sergeant Williams was then notified. Once the offender's disruptive behavior ceased, we assisted the offender up and placed him against the wall. Sergeant Williams entered and relieved Officer Johnson. At no time did I observe any force being used. No injuries to myself, staff, or the offender.

(Pl.'s Trial Ex. 6.)

Whitten then directed Shirks's attention to another written statement provided prior to the hearing on Whitten's disciplinary charge. (Tr. at 173:16–20.) That statement reads as follows:

> I Officer Shirks and Officer Johnson was going to get Offender Whitten to be taken to court. Once the offender was brought out of his cell I Officer Shirks was going threw [*sic*] the paperwork which the offender was taken [*sic*] to court. Offender Whitten said what are you doing and was trying to turn around. Officer Johnson told Whitten to stop trying to turn around and look straight ahead. I Officer Shirks then continued looking threw [*sic*] the paper work and then placed in the tray slot so I could do a cell inspection. Just as I was going in the door I heard the offender being disruptive and turned to come out of cell and the offender was being placed on the ground. Officer Johnson stated that the offender tried to elbow him [in the] face however I had just walked in the cell and didn't personally witness it.

(Pl.'s Trial Ex. 1 at 7.) When asked if the statement was accurate, Shirks testified that he "did not actually go into the cell" as reported in the statement. (Tr. at 175:4–8.) Shirks testified that he "was outside of the cell, getting ready to go in," when the incident occurred and that he "didn't see the incident take place." (*Id.* at 175:18–22.) In response to further questioning, Shirks testified that he "was proceeding to go in the cell and turned to come back" and that he did not recall actually putting a foot inside the cell. (*Id.* at 177:10–15.)

The court asked Shirks why he and Johnson had gone to retrieve Whitten on the morning of January 18, 2018. In response, Shirks testified that they were going to "take [Whitten] to receiving for court." (Tr. at 181:11–14.) When asked if he was aware of the nature of the court proceeding, Shirks responded that he did not know that Whitten had a lawsuit pending or that the lawsuit was against a correctional officer. (*Id.* at 181:17–22.) He only knew

that Whitten "was going to court." (*Id.* at 182:12–14.) Shirks testified that Johnson also knew that Whitten was headed to court. (*Id.* at 182:15–20.)

During cross-examination, defense counsel asked Shirks to summarize his recollection of what happened while he was searching Whitten's paperwork. Shirks testified that Whitten "got aggravated because [he] was going through [Whitten's] paperwork"; Whitten "kept trying to turn around"; and Johnson kept telling Whitten look straight ahead. *Id.* at 183:20–25, 184:1–7.) Shirks testified that he "never" heard Johnson say anything derogatory to Whitten. (*Id.* at 184:20–22.) Shirks also testified that he did not actually witness Johnson taking Whitten to the ground and that he turned in their direction when he heard Whitten yelling. (*Id.* at 184:23–25, 185:1–3.). Shirks further testified that Whitten continued to be verbally disruptive after being taken to the ground but that he was "physically . . . compliant at that point." (*Id.* at 185:18–25, 186:1.)

On redirect, Whitten had Shirks review the video footage of the incident. Shirks acknowledged that the video shows him looking toward Whitten and Johnson at the precise moment Whitten is being taken to the ground. (*Id.* at 194:15–25, 195:1–3.) In response to further questioning, Shirks confirmed that portions of his written statements appear to be inconsistent with the video footage:

> Q.     From looking at [the video], does it appear that you are not stepping into the cell and that you are looking at him taking me to the ground? Is that accurate?
>
> A.     Does it appear that way? Yes, it does.
>
> The Court:     And that would be inconsistent with what you wrote in your report, correct?
>
> Witness:     Yes.

(*Id.* at 195:25, 196:1–7.)

### 4.   Chris Mullins

Chris Mullins is the correctional officer who can be seen in the video sitting at the table on the lower level of the C-4 housing unit at the time of the incident involving Whitten and Johnson. As part of the investigation performed by Lawson, Mullins prepared a written statement on March 5, 2018, which Whitten read into the record. (*Id.* at 198:20–24.) The written statement provides as follows:

> I C/O Mullins was sitting at the table writing in the log book, when I heard commotion on the top tier that's when I observed Johnson holding Whitten down, I didn't hear any verbal exchange between the two.

(Pl.'s Trial Ex. 5 at 23.)

Whitten asked Mullins what drew his attention while he was sitting at the table. Mullins testified that he headed toward the top tier after hearing "commotion." (Tr. at 199:2–6.) Likewise, in response to questions from the court, Mullins again testified that he heard "general commotion" that caused him to look up while sitting at the table. (*Id.* at 201:16–22.)

### 5.   Whitten

Whitten testified next regarding the incident that occurred on the morning of January 18, 2018. Whitten explained that he was on his way to court for a civil case filed against an officer responsible for deploying a dog on him after he stabbed his cellmate at Wallens Ridge. (*Id.* at 206:13–25, 209:2–6, 225:15–23.) Whitten testified that he was "just watching Shirks going through [his legal papers]" when Johnson "started calling [him], 'Boy,'" and "telling

[him] to turn around." (*Id.* at 211:15–25.) When asked what happened next, Whitten testified as follows:

> Mr. Whitten: When he kept calling me "Boy," that's when I took offense, and I said, "Who do you think you're talking to?" And that's when he squeezed me and pulled me towards him. He just gripped my arm real tight and pulled me into his body, and I pulled back. But I'm handcuffed this way . . . .
>
> The Court: When you say you're handcuffed this way, handcuffed behind your back?
>
> Mr. Whitten: Yeah, from behind. So my elbow went towards the railing . . . . But at no point did I try to elbow this man. If would never do that, first of all, first and foremost.

(*Id.* at 212:9–21.)

Whitten testified that he reported the incident to Sergeant Williams, who retrieved a camera, and that two nurses assessed his injuries and observed his ankle bleeding. (*Id.* at 213:14–24.) Whitten testified that his back was sore by the time he got to court; that his "ankle had a nice sized little cut on it"; and that his sock was "a little bloody." (*Id.* at 214:1–2.) Whitten also testified that he was diagnosed with post-traumatic stress disorder ("PTSD") prior to the incident and that the incident "elevated [his] PTSD." (*Id.* at 216:2–12.)

When asked about the disciplinary offense with which he was charged following the incident, Whitten testified that the hearing officer found him guilty of committing the offense. (*Id.* at 214:22–24; *see also* Pl.'s Ex. 1 at 8 (finding that Whitten's actions "did constitute an attempted assault" upon a non-offender).) The hearing officer imposed a fine of $15.00. (Pl.'s Ex. 1 at 8.)

During cross-examination, defense counsel began by reviewing Whitten's disciplinary history with him, which includes at least two violent offenses. (*See* Tr. at 218:16–25 (acknowledging that he stabbed his cellmate at Wallens Ridge and that he "beat [another cellmate] up"). Defense counsel then turned to the incident giving rise to this action. Whitten acknowledged that he "turned [his] head" toward Shirks while Shirks was examining his paperwork. (*Id.* at 226:14–16.) Whitten also acknowledged that he moved his feet "at some point" and that he did not obey Johnson's order to stop turning around. (*Id.* at 227:16–17, 228:8–9.) Whitten testified that he "didn't obey [Johnson's] order" because Johnson was being "verbally disrespectful" to him. (*Id.* at 228:6–7.)

### 6.   Michael Williams

Michael Williams is currently employed as a corrections lieutenant at Red Onion. (*Id.* at 263:11–16.) At the time of the incident at issue, he was the C-building sergeant. (*Id.* at 264:6.) He received information by radio indicating that there had been an incident in the C-4 housing unit. (*Id.* at 264:6–21.) Upon arriving at the housing unit, Williams escorted Whitten to the receiving area to be taken to a transportation room. (*Id.* at 264:23–25.)

Williams testified that he did not recall Whitten "complaining about pain, difficulty walking, abrasions, [or] injuries." (*Id.* at 265:5–7.) Williams also testified that he was present when photographs were taken of Whitten's hands, ankles, and back, and that he did not recall seeing any active bleeding. (*Id.* at 265:8–13.) He further testified that he did not hear Johnson threaten Whitten at any point during his interactions with them. (*Id.* at 265:14–19.) When asked if he would have documented any threat that was actually made, Williams testified that he "would have been compelled to [do so]" as Johnson's supervisor. (*Id.* at 265:20–24.)

On cross-examination by Whitten, Williams testified that he believed he was responsible for photographing Whitten following the incident. (*Id.* at 266:23–25.) Photographs of Whitten's left wrist, ankles, back, face, feet, calves, hands, and torso were admitted into evidence as Plaintiff's Trial Exhibit 8. Williams testified that Whitten was standing in a cell in the receiving unit when the photographs were taken from the other side of a plexiglass window. (*Id.* at 267:19–22.) One of the pictures shows what could be described as a small abrasion on the back of Whitten's right ankle. (*See* Pl.'s Trial Ex. 8 at 2.)

### 7.    Whitten's Medical Records

The parties stipulated to the admission of Whitten's institutional medical records. On January 18, 2018, at approximately 7:30 a.m., Nurse L. Gibson noted that she was called to the receiving area by Sergeant Williams to assess Whitten and that Whitten "reported he was in an altercation with an officer." (Pl.'s Trial. Ex. 7 at 18.) Gibson noted that Whitten's right wrist was "red [with] no edema [and] good range of motion." (*Id.*) She also reported that the posterior side of Whitten's right ankle had a "small open area" approximately "0.5 x 0.5 cm." (*Id.*) She noted that Whitten "refused treatment" and that he could follow up with the medical department as needed. (*Id.*)

On January 24, 2018, Nurse L. Stump examined Whitten during sick call. (*Id.* at 16.) According to the examination notes, Whitten reported being "slammed to the floor causing back and ankle pain." (*Id.*) Stump's examination findings included "scabbed over abrasions" on Whitten's ankles with "no swelling noted." (*Id.*) She gave Whitten Tylenol and noted that he did not require referral for additional treatment. (*Id.*)

- 23 -

8.      **Trial Transcript**

The parties also stipulated to the admission of the trial transcript from *Whitten v. Gunter*, 7:16-cv-00195 (W.D. Va.), the court proceeding for which Whitten was being prepared for transport. (*See* Def.'s Trial Ex. 4.) The transcript reflects that, on the first day of trial on January 17, 2018, Whitten informed the presiding judge that two non-party correctional officers named Cully and Meade had threatened to harm him when he returned from court. (*Id.* at 26.) Prior to the start of the second day of trial on January 18, 2018, Whitten reported as follows:

> This morning, . . . the same thing I was telling you yesterday that might take place -- the officer jumped on me this morning and tapped me to the floor and put the cuffs and stuff down, and kneed on the cuffs so bad, it made me start bleeding, and my back is a little sore.
>
> And he made a statement . . . , when I get back, he will do some more to me. They refused to give me his name. He didn't have a badge on, so I don't know his name.

(*Id.* at 216–17.)

### III.   STANDARD OF REVIEW

"In a nonjury civil case, a [plaintiff] must satisfy the district court that the truth of each element of his claim has been demonstrated by a preponderance of the evidence." *Fenton v. Freedman*, 748 F.2d 1358, 1361 (9th Cir. 1984). "[A] party proves a fact by a preponderance of the evidence when he proves that the fact's existence is more likely than not." *Doe v. Princeton Univ.*, 30 F.4th 335, 347 (3d Cir. 2022) (internal quotation marks and citation omitted). In determining whether a party has met this burden in a civil case tried without a jury, the "court alone determines the credibility of the witnesses, and the weight to be attached to their testimony." *Fenton*, 748 F.2d at 1361. The court is responsible for "finding the facts, weighing

the evidence, and choosing from among conflicting interferences and conclusions those which [it] considers most reasonable." *Select Auto Imps. Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 823 (E.D. Va. 2016) (citing *Penn-Texas Corp. v. Morse*, 242 F.2d 243, 247 (7th Cir. 1957).

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the court is required to make specific findings of fact and separately state its conclusions of law. "The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). The court "must do more than announce statements of ultimate fact," *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986), but is not required "to make findings on all facts presented or to make detailed evidentiary findings," *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (internal quotation marks and citation omitted). "The ultimate test as to the adequacy of findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *Id.*

## IV.   Findings of Fact

### A.   Factual Findings on the Issue of Spoliation

The court will first address the testimony and evidence presented during the evidentiary hearing on Whitten's second motion for spoliation sanctions. The parties dispute whether prison officials could have saved footage from a fourth video camera located in the C-4 housing unit, which can be seen in front of a window above an entry door in the still photograph admitted as Plaintiff's Evidentiary Hearing Exhibit 1. The resolution of this issue ultimately turns on whether the court credits the VDOC employees' testimony that the camera

- 25 -

depicted in the photograph is a nonoperational Rapid Eye camera or Whitten's testimony that the camera is a MaxPro camera. Having considered the testimony and other evidence presented, the court credits the testimony of the VDOC employees.

At trial, the court found Wesley Graham's testimony to be particularly reliable and persuasive. As an electronics technician at Red Onion, Graham has working knowledge of the video cameras utilized at Red Onion and he was employed at the prison when the VDOC switched from using the Rapid Eye camera system to the MaxPro system. Graham testified that three MaxPro cameras were installed in the C-4 housing unit in 2016 and that the prison completely stopped using the Rapid Eye system approximately 90 days later. Although the Rapid Eye hardware remained in the housing units for several more years, Graham testified—consistent with Lieutenant Stanley's supplemental affidavit—that the Rapid Eye cameras were no longer recording video footage when the incident at issue occurred in January 2018. Additionally, both Graham and Fannin identified the camera depicted in front of the window above the entry door in the photograph as one of the Rapid Eye cameras that has since been removed from the housing unit. That camera differs in appearance from another camera depicted in the photograph, which Fannin identified as a MaxPro camera. Although Whitten identified the camera shown above the entry door as one of the MaxPro cameras that he purportedly observed being installed in 2016, the court did not find Whitten's testimony in this regard to be reliable. In reaching this conclusion, the court notes that Whitten was unable to recall other important details from the same time period, including the location of his housing unit or cell.

Based on the testimony and exhibits presented at the evidentiary hearing and the court's evaluation of the credibility of the witnesses, the court makes the following findings of fact relevant to Whitten's second motion for spoliation sanctions:

1.      In mid-to-late 2016, Red Onion installed the MaxPro camera system to use instead of the existing Rapid Eye camera system.

2.      Three MaxPro cameras were installed the C-4 housing unit.

3.      Following the installation of the MaxPro cameras, the Rapid Eye system continued to operate for approximately 90 days. The prison then turned off the recording equipment for the Rapid Eye system and exclusively used the MaxPro system to record surveillance footage.

4.      The Rapid Eye cameras remained in the housing units at Red Onion until six or eight months prior to the evidentiary hearing in this case, even though they were no longer operational.

5.      The camera depicted in front of a window above the entry door in Plaintiff's Evidentiary Hearing Exhibit 1 is a Rapid Eye camera.

6.      Although that Rapid Eye camera was still mounted on the wall in the C-4 housing unit on January 18, 2018, it was no longer being used to record video footage at that time. The only operational cameras in the housing unit were the MaxPro cameras.

7.      Prison officials preserved footage from the MaxPro camera that provided the clearest view of the incident involving Whitten and Johnson, and Johnson played no role in deciding which footage to retain.

### B.     Factual Findings on the Merits of Whitten's Claims

The court turns now to the testimony and evidence presented at trial relating to Whitten's claims of excessive force and retaliation. Some of the facts are undisputed, and other facts require the court to make credibility assessments. The court has carefully reviewed the trial testimony, the retained video footage of the incident in question, and other exhibits admitted at trial. In deciding whether to credit all or part of a witness's testimony, the court has considered several factors, including whether the testimony is consistent with other evidence; whether a witness has made inconsistent statements on a material issue of fact; and the witness's background, experience, and demeanor.

It is clear from the video footage that the incident giving rise to this action occurred in a matter of seconds. At the 06:50 mark of the recording, Whitten exits his cell and stands with his left side facing Johnson, while Shirks stands behind Whitten examining his paperwork. Less than 20 seconds later, Johnson takes Whitten to the ground. The resolution of each of Whitten's claims largely turns on what transpired during the intervening seconds.

Johnson and Shirks both testified that Whitten became aggravated or upset while Shirks was looking through his paperwork, and their testimony in this regard is generally consistent with their prior statements describing Whitten as irate or disruptive. Johnson and Shirks also consistently testified that Whitten kept trying to turn in Shirks's direction despite being ordered by Johnson to face forward. Their testimony in this regard is consistent with the video footage that shows Whitten turning his head to the left toward Shirks, and Johnson pointing in the opposite direction on more than one occasion. Additionally, Whitten

acknowledged on cross-examination that he turned toward Shirks while Shirks was examining his paperwork, and that he did not obey Johnson's order to stop turning toward Shirks.

One of the primary disputes is what happened in the few seconds after Johnson directed Whitten to face forward and before Johnson placed Whitten on the ground. Johnson testified at trial that Whitten tried to elbow him in the face, and Johnson's testimony in this regard is consistent with the written statements he provided following the incident. Although Whitten has repeatedly denied attempting to elbow Johnson, Lawson's investigative report indicates that Whitten acknowledged that his "left elbow came slightly up" before Johnson placed him on the ground. (Pl.'s Trial Ex. 5 at 3.) Moreover, in the still frame captured from the video recording at the 07:07 mark, Whitten's head is turned to the left (toward Johnson), his right knee is bent, and his right arm is positioned in a manner that would cause his left elbow to rise toward Johnson. Even if Whitten was not attempting to elbow Johnson in the face, the court credits Johnson's testimony that Whitten's particular movements led him to believe that Whitten was attempting to do so.

The court also credits Johnson's testimony that he only used enough force to gain control of the situation. At the 07:09 mark of the video, Johnson can be seen taking Whitten to the ground. Whitten lands on his right side followed by Johnson, and part of Johnson's body is positioned on top of Whitten. Approximately 20 seconds later, at the 07:29 mark, Johnson rises to his knees, lifting all but his arms and hands from Whitten's body. Johnson and Shirks proceed to lift Whitten off the ground, and by the 07:55 mark, all three men are standing together. Additionally, it does not appear from the video that Johnson placed any part of his body on Whitten's ankles after they landed on the ground, much less that Johnson

pressed his full weight on the leg shackles in an effort to cause physical harm, as Whitten initially claimed. Moreover, the examination notes recorded immediately following the incident reflect that Whitten had good range of motion in his wrists with no observed swelling and that he had a one-half centimeter open area on the back of his right ankle for which he refused treatment. The description of the right ankle is consistent with one of the photographs taken following the incident that shows a small abrasion.

Additionally, the court is unable to find that Johnson's actions against Whitten were taken in retaliation for filing a federal lawsuit against a Wallens Ridge correctional officer. The court recognizes that Johnson's testimony regarding the pending court matter was somewhat inconsistent. For instance, when asked if he was responsible for preparing Whitten to be transported to federal court, Johnson responded in the affirmative, but he later testified that he did not know whether Whitten was going to federal court or state court. On the other hand, the lawsuit did not involve any officers at Red Onion, and both Whitten and Shirks testified that they had not heard anything at Red Onion regarding the lawsuit. Likewise, Whitten testified that he did not talk to Johnson about the lawsuit. In any event, even if the court were to accept Whitten's testimony that correctional officers are typically aware of such information, the court does not find it believable that the lawsuit played a role in the use of force or the filing of the disciplinary charge. Instead, the court believes Johnson thought Whitten was going to elbow him in the face, and that Johnson would have reacted in the same manner even if Whitten had not filed the lawsuit.

The court also finds that Whitten has not proven that Johnson made any comments threatening to harm Whitten. Johnson denied making any racist or derogatory comments to

Whitten, and both Shirks and Williams denied hearing the comments that were attributed to Johnson.[4] Additionally, even if the court were to credit Whitten's testimony that Johnson referred to him as "boy" when directing him to face forward, it is undisputed that Whitten repeatedly failed (or refused) to obey Johnson's direct orders.

Based on the testimony and evidence presented at trial and the court's evaluation of the credibility of the of the of the witnesses, the court makes the following findings of fact relevant to the merits of Whitten's claims of excessive force and retaliation:

1.      On January 18, 2018, Whitten was incarcerated in cell 412 on the second level of the C-4 housing unit at Red Onion, a maximum-security prison. He was scheduled to appear in federal court that morning for the second day of a jury trial in a lawsuit that he had filed against a correctional officer at Wallens Ridge.

2.      Correctional Officers Johnson and Shirks were tasked with searching Whitten and preparing him to be transported to the federal courthouse. Both officers knew that Whitten was headed to court, but Whitten did not discuss the lawsuit with Johnson or present any direct evidence establishing that Johnson was aware that it involved a correctional officer.

---

[4] The court recognizes that Whitten pointed out inconsistencies in other portions of Shirks's testimony and written statements, including his testimony that he did not see Johnson take Whitten to the ground. The video footage shows Shirks turning his head toward Johnson as the takedown occurs, and Shirks can be seen moving toward Johnson and Whitten as they fall to the ground. The court also recognizes that the takedown was a split-second decision by Johnson and that it occurred nearly five years before Shirks and other witnesses testified at trial. In any event, any discrepancy or inconsistency as to whether Shirks witnessed the takedown does not alter the court's findings and conclusions with respect to whether the use of force exceeded constitutional limits.

3.      Johnson and Shirks arrived at Whitten's cell at approximately 7:17 a.m. Approximately six minutes later, Whitten exited the cell in handcuffs and leg restraints. Whitten's wrists were cuffed behind his back.

4.      Upon exiting the cell, Whitten turned his body so that his left side was facing Johnson, who was positioned between Whitten and the entrance to the cell. Johnson guarded Whitten while Shirks stood behind Whitten examining the paperwork that he intended to take to court.

5.      Whitten became aggravated while Shirks was examining his paperwork, and he turned his head to the left toward Shirks. Johnson ordered Whitten to face forward, but Whitten did not obey Johnson's orders.

6.      Whitten moved his body in a manner that led Johnson to believe that Whitten was going to strike him in the face with his left elbow. In response, Johnson immediately took Whitten to the ground.

7.      Whitten and Johnson landed on their right sides, and part of Johnson's body was positioned on top of Whitten for approximately 20 seconds before Johnson rose to his knees. Less than 30 seconds later, Johnson and Shirks lifted Whitten from the ground.

8.      Johnson held Whitten on the ground long enough to ensure that he had control of the inmate. Whitten did not physically struggle with Johnson after they landed on the ground, and Johnson did not strike Whitten or take any other action intended to harm Whitten. Johnson did not threaten to harm Whitten following the incident.

9.      A few minutes later, Nurse Gibson examined Whitten, and Williams photographed Whitten's body. Whitten's right wrist was red but not swollen, and he had good

range of motion in his wrist. Whitten also had a small open area on the back of his right ankle for which he refused treatment.

10. That same day, Johnson filed a disciplinary offense report in which he charged Whitten with attempted assault on a non-offender. A disciplinary hearing officer found Whitten guilty of the charge and imposed a $15 fine.

11. Johnson did not file the disciplinary charge or use force against Whitten to retaliate against him for filing a lawsuit against a Wallens Ridge Correctional Officer or for proceeding to trial against the officer. Johnson believed that Whitten was attempting to elbow him in the face, and the court finds that he would have taken the same actions even if Whitten had not filed the lawsuit or been on his way to court.

12. On January 24, 2018, Whitten presented to Nurse Stump with complaints of back and ankle pain. At that point, the abrasion on Whitten's ankle was "scabbed over" and he had no visible swelling. Stump gave Whitten Tylenol and determined that he did not require referral for additional treatment.

## V.    Conclusions of Law

### A.    Whitten's Second Motion for Spoliation Sanctions

The court will first address Whitten's motion for sanctions based on the alleged spoliation of video footage from a fourth camera in the C-4 housing unit. "Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). The spoliation of video footage and other electronically stored information is governed by Federal Rule of Civil Procedure 37(e). *See Wall*

*v. Rasnick*, 42 F.4th 214, 222–23 (4th Cir. 2022) (discussing Rule 37(e) in the context of prison video recordings). Under this rule, the court may impose sanctions when "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If the court finds that "the loss of the information" has prejudiced the moving party, the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). If the court finds that the offending party "acted with the intent to deprive another party of the information's use in the litigation," the court may "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (c) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2).

As reflected in the language cited above, Rule 37(e) "applies only when [electronically stored] information is lost." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Whitten, as the party seeking spoliation sanctions, has "the burden to establish that [prison officials] lost or destroyed the video footage at issue." *Ball v. George Wash. Univ.*, 798 F. App'x 654, 655 (D.C. Cir. 2020). Since "spoliation sanctions can be imposed only when the party seeking such sanctions demonstrates that relevant evidence has been lost," Whitten "must necessarily show that the evidence at issue actually existed." *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 175–76 (S.D.N.Y. 2022) (internal quotation marks and citation omitted); *see also Okezie v. Prince George's Cnty., Md.*, No. 8:13-cv-00168, 2014 WL 1429183, at *2 (D. Md. Apr. 11, 2014) ("The threshold issue in any motion for spoliation is that the items

- 34 -

purportedly destroyed lost or lost actually existed . . . A party must prove, not simply believe, that evidence was destroyed or suppressed.").

The court concludes that Whitten failed to meet his burden of establishing that footage from a fourth camera actually existed and was lost or destroyed. For the reasons set forth above, the court finds that the C-4 housing unit only had three MaxPro cameras on January 18, 2018, and that the fourth camera depicted in a photograph of the housing unit is a Rapid Eye camera. Because the Rapid Eye system was no longer recording video footage in January 2018, no recorded video footage actually existed from the fourth camera. And "footage that was never filmed cannot support [a] motion claiming that the defendant[] should be sanctioned for spoliation." *Canady v. Bostic*, No. 7:17-cv-00464, 2022 WL 541783, at *3 (W.D. Va. Feb. 23, 2022). Accordingly, Whitten's second motion for spoliation sanctions will be denied.

### B.    The Merits of Whitten's Claims

Whitten filed suit against Johnson under 42 U.S.C. § 1983, which "provides a cause of action against any person who deprives an individual of federally guaranteed rights under color of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). Whitten claims that Johnson used excessive force against him in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Whitten also claims that Johnson retaliated against him for suing a correctional officer by using force against him and by filing an allegedly false disciplinary charge, in violation of the First Amendment.

### 1.    Excessive Force

An Eighth Amendment claim of excessive force involves both an objective and a subjective component. *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). "The objective

component measures the nature of the force employed, asking whether that force 'was sufficiently serious to establish a cause of action.'" *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021) (quoting *Brooks*, 924 F.3d at 112). "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice." *Id.*

The dispute in this case centers on the subjective component, which asks whether the correctional officer "acted with a sufficiently culpable state of mind." *Id.* (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). "In contrast to the objective component, this is a demanding standard; the state of mind required . . . is wantonness in the infliction of pain." *Brooks*, 924 F.3d at 112 (internal quotation marks and citations omitted). "Whether an inmate can establish that impermissible motive turns on 'whether force was applied in a good[-]faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Dean*, 984 F.3d at 302 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

The subjective component may be proved through direct or circumstantial evidence. *Dean*, 984 F.3d at 308–09. In *Whitley*, the Supreme Court identified "four non-exclusive factors" to assist in assessing whether an officer acted with a sufficiently culpable state of mind. *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008). Those factors are: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) 'any efforts made to temper the severity of a forceful response.'" *Id.* (quoting *Whitley*, 475 U.S. at 321).

Having carefully considered the testimony and other evidence presented at trial, the court concludes that Whitten failed to prove that Johnson acted with a sufficiently culpable

state of mind. Based on the court's factual findings, each of the *Whitley* factors supports the conclusion that Johnson applied force "in a good[-]faith effort to maintain or restore discipline" rather than "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal quotation marks and citations omitted).

The Fourth Circuit has recognized that "officers employ force in 'good faith'—and thus permissibly—when they are motivated by an 'immediate risk[] to physical safety' or threat to prison order." *Dean*, 984 F.3d at 302 (alteration in original) (quoting *Brooks*, 924 F.3d at 113); *see also Brooks*, 924 F.3d at 116 (noting that "a manifest and immediate need for the protective use of force gives rise to a powerful logical inference that officers in fact used force for just that reason"); *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009) (explaining the importance of inmates following orders and emphasizing that "it is without rational dispute that security officials are justified in maintaining decorum and discipline among inmates to minimize risks to themselves and other inmates"). It is undisputed that Whitten failed to obey Johnson's orders to face forward, and Johnson credibly testified that Whitten moved his body in a manner that led Johnson to believe that Whitten was going to elbow him in the face. Thus, the first *Whitley* factor—the need for the application of force—and the third *Whitley* factor—the perceived threat that the application of force was intended to quell—weigh in Johnson's favor.

The same is true for the second *Whitley* factor—the relationship between the need for the application of force and the amount of force used. The only physical force used by Johnson was the brief takedown of Whitten to the ground. Johnson initiated the takedown to protect himself from being elbowed in the face by Whitten. Johnson's reaction was commensurate

with the need to prevent the perceived assault, and the court finds no basis to second guess his split-second decision. *See Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002) ("Because prison officials 'must make their decisions in haste, under pressure, and frequently without the luxury of a second chance,' [courts] must grant them 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'") (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)); *see also Miles v. Jackson*, 757 F. App'x 828, 830 (11th Cir. 2018) (holding that "[t]he use of a takedown is not disproportionate to the need to control an inmate who has failed to obey a jailor's orders") (internal quotation marks and citation omitted).

The fourth *Whitley* factor—whether actions were taken to temper the severity of the forceful response—also weighs in favor of finding that Johnson applied force in a good-faith effort to maintain and restore discipline. The video footage supports Johnson's testimony that he only used enough force to gain control of the situation. Johnson positioned only part of his body on top of Whitten after they fell to the ground, and he remained in that position for no more than 20 seconds before rising to a kneeling position beside Whitten.

Finally, while not dispositive, neither the photographs nor the examinations notes recorded following the incident reflect the existence of any significant injury resulting from the use of force. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) ("[T]he extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. The extent of injury may also provide some indication of the amount of force applied.") (internal quotation marks and citations omitted); *see also Miles*, 757 F. App'x at 830 (noting that the lack of serious injury also supported the

district court's conclusion that officers did not use excessive force in subduing a non-compliant inmate, and that "the only treatment deemed necessary after the incident was a Tylenol prescription").

Applying the relevant factors, the court concludes that Whitten failed to prove by a preponderance of the evidence that Johnson used force "maliciously and sadistically for the very purpose of causing harm," rather than as part of "a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21. Accordingly, the court will enter judgment in Johnson's favor on the claim of excessive force.

### 2.      Retaliation

To prevail on each of his retaliation claims, Whitten must establish three elements: (1) that he engaged in activity protected by the First Amendment; (2) that Johnson took some action that adversely affected his First Amendment rights; and (3) that there was a causal relationship between his protected activity and Johnson's conduct. *Martin v. Duffy* (*Martin II*), 977 F.3d 294, 299 (4th Cir. 2020) (citing *Martin v. Duffy* (*Martin I*), 858 F.3d 239, 249 (4th Cir. 2017)).

The first element is undisputed in this case. By filing a lawsuit against a correctional officer at Wallens Ridge, Whitten engaged in activity protected by the First Amendment. *See Am. Civil Liberties Union, Inc. v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993) ("The filing of a lawsuit carries significant constitutional protections, implicating the First Amendment right to petition the government for redress of grievances, and the right of access to courts.") (internal quotation marks and citation omitted).

With regard to the second element, the Fourth Circuit has held that "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (internal quotation marks and citations omitted). The alleged retaliatory actions in this case are the use of force and the filing of a disciplinary charge. The court will assume that both actions satisfy the second element and focus its attention on the third element: causation.

The Fourth Circuit has directed district courts to apply the "same-decision test" of *Mt. Healthy City Schools District Board of Education v. Doyle*, 429 U.S. 274 (1977), in evaluating the causation element. *Martin II*, 977 F.3d at 299. That test requires the plaintiff to demonstrate that his protected activity was "a substantial or motivating factor" in the defendant's action. *Id.* at 301. If the plaintiff makes this showing, the defendant may escape liability by establishing that he would have taken the same action in the absence of the plaintiff's protected activity. *Id.* at 299–300; *see also id.* at 302 ("If a prison official shows she would have taken the same actions if the inmate engaged only in misconduct, courts logically infer legitimate reasons caused the adverse action, not retaliatory ones.").

In this case, both Johnson and Shirks testified that they had not heard anything at Red Onion regarding Whitten's lawsuit against a Wallens Ridge correctional officer, and Whitten testified that he did not talk to Johnson about the lawsuit. Without evidence indicating that Johnson had knowledge of the lawsuit, Whitten is unable to demonstrate that his First Amendment activity was a substantial or motivating factor in the use of force by Johnson or the filing of the disciplinary charge. *See Constantine*, 411 F.3d at 501 ("In order to establish [the

requisite] causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of [him] engaging in protective activity. Knowledge alone, however, does not establish a causal connection between the protected activity and the adverse action. There must also be some degree of temporal proximity . . . .") (internal quotation marks and citations omitted). Even assuming, however, that Johnson was aware of the lawsuit, Johnson credibly testified that he believed Whitten was going to elbow him in the face, and the court has found that Johnson would have taken the same actions in the absence of Whitten's protected activity. Consequently, both retaliation claims fail on the causation element, and Johnson is entitled to judgment in his favor.

## VI.   CONCLUSION

For the reasons stated, the court will deny Whitten's second motion for spoliation sanctions (ECF No. 88) and enter judgment in favor of Johnson on Whitten's claims of excessive force and retaliation.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 13th day of March, 2023.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE